Good morning, Your Honors, and may it please the Court, Adam Schleifer on behalf of the Plaintiff Appellant of the United States. With the Court's permission, I would like to reserve three minutes for rebuttal. The question in this case reduces essentially to, did officers have probable cause to believe that the defendant, a violent felony probationer, subject to suspicionless search conditions? And what's the relevance of that? Well, under this Court and the Supreme Court's precedence, the violent felony probationer can be subjected to suspicionless search conditions consistent with the Fourth Amendment. I mean, your whole brief was written that way. All right, he's violent. All right, he's a drug dealer. But none of that's the question before us. Certainly the question is not whether he's a drug dealer, but it's the fact that he's a violent felony probationer, not a drug dealer. Well, he's a probationer. We don't have any trouble with that. We know what his terms and conditions of probation are. What he did or what he didn't do is of no essence. We know what the terms and conditions. But nonetheless, even with all those terms and conditions, probable cause requires that the officer have the probable cause that this was the probationer's residence at the time, correct? Correct. And that's what we're here for. Yes. Did they have the probable cause? Absolutely, Your Honor. All right. So then let's get there. Sure. So first, let's talk about what probable cause is and isn't. It should be – I do want to emphasize that the Supreme Court has repeatedly, starting from Illinois v. Gates, but even through Wesby, which, of course, the government cited at length in its reply brief, it has consistently emphasized that probable cause is not a high bar and that it only requires a, quote, kind of fair probability on which reasonable and prudent people, not legal technicians. But this is a weird probable cause. It's not the usual probable cause that he committed a crime. No. In fact, Your Honor, that is – the government's position is that to the extent that Granberry or any other case said, and Granberry does say, stringent, that is absolutely inconsistent with Wesby and under Miller v. Gammey  Oh, really? that it actually is the standard probable cause. There's no special probable cause for this area. Right. That's true. It's the standard probable cause. Right. But it's applied to a different thing. Sure. But just so that we have our terms defined before we engage in the algebra, the real question is what are we pointing toward? All we're pointing toward – You think all of our prior cases should be in the garbage? The ones that deal with this particular question and set up some things to look at? I wouldn't say in the garbage, but I would say this. You seem to be saying that. No, no. I would say this. You just cited Miller v. Gammey to me. That means it's out the window. It doesn't exist. Only to the extent that it says that – that it suggests. It doesn't say. But there is some slippage here, and analytically I just want to be clear.  Right. Okay. There's only one probable cause standard. It is the standard that the Wesby passed. Now, why don't we get to the details? Okay. So why – so then understanding what the probable cause standard is, it's the Wesby standard. Why is there a probable cause in this case? Okay. So for at least four or five reasons. So first, officers saw the defendant at this building. That is 100 percent irrelevant, is it not? No, it's not at all. In other words, all they saw four months before standing in front of the building. Right. So, again, and I should – so the characterization that that is irrelevant would be the same analytical error that the district court engaged in, which is refusing to assay all the facts. Think of it like there is water in a pot and each stone raises the level. So dividing and conquering is a problem. So all you're suggesting is this is one fact upon which one can establish probable cause, that they saw this guy in front of the building. Indeed, and it's the second Howard – Four months before. Yes, but it is – Four months before. That's right. So that's one fact. One fact. It is the second Howard fact because Howard has a four-part test where it observes what other cases have looked to. So one of those factors is did any direct observation – Why does that confirm to the officers that there's good reason to suspect that the prole was using a different residence? Indeed, it doesn't confirm. I mean, he's in front of a residence, and because he's in front of it, it automatically says good reason he lives there? No, no. It's not that alone. So it's one of many facts. So the first fact – Okay, so I don't think it has a whole lot to do with that particular situation. Well, but it does do two – But go on. Let's hear your other facts. So it does do two very important things. The fact that they saw him there is a direct observation. Did he have a key? No. Did they keep doing anything domestic in that place? Did they sit there even for one day to see whether he went in and out of the building? Not in June, but – Never. No, they did not do surveillance because they saw him there, and then they have a fellow gang member, and this corroborates. So the importance of the June sighting is it corroborates what the fellow gang member says, a neighbor of his, who says Debo, his gang name, lives in Unit 26. So we're talking about this informant? Yes. This informant who has – how long has he been an informant? Well, at that time, that was the first time he informed for Detective Skibar. Do we even know him? Detective Skibar developed him for this investigation. Does the judge even get any idea of who this informant was? All a judge knows is there's a guy who tells the police, who they've never used an informant before, that this guy lives there. Isn't that the best we could say for that? Well, and it's corroborated by the fact that they saw him there. So now you have two interlocking facts. It's corroborated by the fact that he was in front of it? Yeah. So if somebody comes and says, Smith, I saw him in front of this courthouse, and another guy who we don't even know who it is says, and he lives in this courthouse, that's good enough? No, it wouldn't be alone. So then we have more. So we have those things, and now we're still adding, right? So then we go to the fact that the informant said specifically the unit, right, which is not the case in some of the case law. So now we have the unit, and then we have the officers. So the fact that this guy we don't know says, and he lives on the sixth floor in D-502, that makes him live there? Well, that's certainly one relevant fact. So now we go forward, and what do we have next? They call the probation office, and this is an important point because I believe this is a misapprehension on my colleague, the appellee's part. Officer Schlobaum reads the supervision history to Detective Skibar, which says we went to his place at least six, by my count eight, but six to eight times in the last ten months, never once did we find him there. So that is read to the detective. Well, first of all, that's shaky in the sense that various things were said about what was said to them. What she wrote didn't say anything about that. Yes, it does, Your Honor. What? Yes, it absolutely does. What she wrote in her report? Oh, I'm sorry. What Officer Schlobaum wrote in her report. Then she says, I would have told him that they tried to find him and he wasn't there, generally. Well, she said, I specifically remember doing that and telling Detective Skibar that they hadn't found him there. Right, but I don't know about the numbers and all that. No, no. So if the court wants to consult. What did the district court say about that? I was confused. Well, the district court explicitly declined to make a single factual finding. And as to Schlobaum, the defendant himself waived any cross and accepted the entirety of her declaration, a material part of which was I read the supervision history, which has every time they never saw him at the house. Okay, Counselor. Counselor, if the district court did not factually determine that that is a fact upon which I can rely, can I rely on it? Well. Now, think about it. This is a standard of review for a determination on probable cause. That's right. So the standard of review is de novo as to the legal threshold of probable cause. As to the legal application. Yes. But what about the facts? So as to the facts, if the court feels that there are any disputed facts that are relevant to that that were not determined, then it should remand. But here. So if, in fact, the district court did not determine that this was a fact, can I rely on it? Because the district court explicitly disclaimed making any factual findings, all this court is left to do is either say, as a matter of law, the district court should not have disclaimed any factual findings, or if factual findings are needed, remand to make them in the first instance. Well, I mean, I'm looking at the Shlom. Is there just one Shlom declaration? Yes. She doesn't say what you said she said. Yes, she does. I'm sorry. Just a minute. She says, I specifically recall discussing the defendant's probation search conditions and his supervision history. I specifically recall reviewing and discussing with Detective Skibar the notes of the supervision history, describing the numerous unsuccesses. She doesn't say she read it to them. That is so. She doesn't say what? So she refers to Exhibits A and B. Exhibits A and B are the enumerated. Are what? See where she says, it says declaration Exhibits A and B in paragraph 4? Yes. So what she says, I specifically recall discussing the defendant's probation search and his supervision history. The supervision history, Exhibit A that she's referring to there, if you look at GR 166. But she said she discussed it with him. She didn't say she read it to him. But what she's talking about, if you look at GR 166, the supervision history itself is literally every time they went to the place. I understand that. But she didn't say she read it to him or told him in detail. She discussed it with him. Right. Right. So there are only two possibilities. She discussed. There's three possibilities. She simply said there is a history, which wouldn't be much of a discussion. No. Presumably what she said is pretty much what she says she says. There were numerous unsuccessful visits. Right. To interview. That's all she said. She didn't say how many. She didn't say what they found. She didn't say they went to the bedroom. She didn't say any of that. She just said there were numerous. She just discussed with them that they tried to find him there and they didn't find him there. And as case after case in this Court has held, that's a one of the four factors under Pelley. But just a minute. Just a minute. That's not all. It's not only that. But as I read the record, it says that they went out there two times. There was nobody present. Four times he wasn't present, but they were told he was at work. That's right. Why does that suggest that he has another residence? Because as Watts, Daly, and the special concurrences in Granberry and Howard. Now, just a minute. I read Watts and Daly, and neither one of Watts or Daly has these facts in front of them. Two times there was nobody at the house. Four times there was somebody at the house, and they just said the person was at work. That's quite a different story. And twice they went into the bedroom. See, none of this. We have no reason to think that any of this was communicated to Detective Skipper or any of this detail. But I guess I want to add to this because now I'm talking about facts, and as I read what the district court said, the judge did not use any of this because in the district court's opinion, there was no evidence that Skibar knew anything about this. And that is an excellent point, Your Honor, because the district court, I want to highlight what the district court actually did. It said it need not make any such determinations because it divided and conquered each fact in isolation, and then when it got to the last fact, it said this alone cannot predicate probable cause. So that's the legal error. I understand. It should have made findings. I wanted to know what you were going to say about these facts that I'm to give the district court some credit about. But it made no findings. It explicitly said that they didn't need to make any findings because it made the same Wesby error that it would be here to similarly take each fact in isolation. I know I'm a bit over, so I just want to say very quickly, the key thing is that they then went to the house and knocked on the door, and before entering, they see the defendant inside of the house, which is one very good piece of corroborating evidence that he lives there. That sounds pretty great if you tell the whole story. The whole story is they went there, there was a screen, and the door was half open behind the screen. They didn't knock on the screen. They opened the screen. Then after opening the screen with the door half open, they knock on that door, and it goes wide open, and they see somebody. That's what really happened, isn't it? That's very close, but not quite. The only thing that is slightly different from that recitation is it wasn't half open. It was slightly ajar. Okay, slightly ajar, but nonetheless, the knock knocked it open. That's correct. But under Arianna Ochoa, Judge Kleinfeld said there's nothing wrong with that per se, unless the other door is wide open. But the larger question is what did they learn from that? They have this woman there, and she says, I don't live here. I'm visiting him. And that proves that what? Well, consistent with the tip and the fact that they saw him there, they now see him in the apartment, the informant said he lives in. He's sitting in the living room with a woman who says, I'm visiting this guy. I mean, this is the ‑‑ if that's not paradigmatic, what reasonable people, reasonably prudent people and not legal technicians would conclude, I don't know what is. And to the extent that this Court requires more to reach probable cause, I would simply submit that's inconsistent with Wesby and it is inconsistent with every magistrate warrant in the history of warrants. Your time is up. But I'm trying to understand what ultimately we're looking for. Apparently, although this wasn't known to the searching person at the time, Vasquez actually had told his probation officer that he was staying with this woman in Pomona, you know, somewhat. Yes. And he told him afterwards that he was staying with her about three days a week, and the rest of the time he was staying at this other house. All right. Suppose that was true. Then what would the result be? Would he live at the house or didn't he live at the house in Pomona? In other words, what would Freddy Rodriguez, the probation officer who heard that, be entitled to think? Well, that in connection with his declaration, which he says, I heavily suspected he didn't live in Ontario. But his ultimate story was he did live there, you know, more than half the time. No, no. Freddy Rodriguez said that that was what defendant told him, but he only confronted the defendant on that point because he said, look, we've been into this room. Your stuff isn't here. Right. And he said, I stay with her a bunch. And he later said, yeah, I stay with her about three days a week. This is not a trick question. I don't know exactly what we're looking for, and we're looking for where he lived. If he lived in two places, then, or if he stayed a lot at her house but his official residence was the other one, he was there more than half the time, does he live there or doesn't he live there? Then he lives in both, Your Honor, because the whole reason why we're even talking about this, as we all know, if they had just walked into the sister's house, which he had listed, which is, of course, what Judge Watford and Judge Noonan pointed out, we wouldn't be having this discussion. So we're only here because he's transported, in the government's view, respectfully, erroneously, his overnight guest status to a new place. But to the extent that he lives in both places, then his rights revert to what they would be if one lives in Ontario. To put it another way, and by the way, he did live falsely in Pomona. I don't really understand the point about what you mean. You're saying Earl O. Kreisler is erroneous. So you're basically saying that even, I mean, as you know, I wrote a concurrence to that objection, and I basically said this is how California decided to set it up. And it had a good reason, which is it didn't want people barging into other people's houses. And if there's a problem here, it's Michigan v. Long, not our case law. So what's wrong with that? In other words, why does he have less rights than anybody else if he's an overnight guest? I'd love to answer that question. I'm very glad you asked. The reason is because one has to first say, what are the defendant's rights under the Fourth Amendment in the house he lists with probation? And Knights and all the other cases say literally zero. He has... Right, in the house that he lives in. Exactly. So then we say, so why is there, why does he have, why does the law enforcement community have to then do a full-fledged investigation? Because they wrote the condition that way. Maybe they could have written it otherwise, but they didn't. But this Court's precedents on that explicitly don't say that. They track... Well, I... They track the general Fourth Amendment. In other words, they don't look to each state's supervision history, which, by the way, in California, recognizing that we said this in Granbury and, Judge Berzon, you were not inclined to agree with it in your special concurrence, but we argued there you have to look at the conditions, which here he says, you can look at all my property and all my stuff and go into any residence. So that's the first thing. But anyway, what we're doing here is... I'm sorry, but that's not the condition. Anyway, it's all very interesting. It's not really in this case. Thank you very much for your argument. Thank you for your argument, Counselor. Thank you. Your Honors, may it please the Court, Alyssa Bell on behalf of Appellee Stephen Vasquez. Your Honor, Judge Berzon, I believe, had it exactly right when she said, did they try to sit there even for one day? I think that really is the crux of this case. The officers did zero surveillance, so we have none of the traditional indicia of residency that this Court has pointed to again and again in the case law. Does he stay there late at night? Is he present there in the early morning hours? Does he have a key to the residence? Does he receive packages or mail there? Does he take in the laundry? Does he take in the dry clean? Does he take out the trash? Does he have pets there? Does he call it my place? Is there a co-resident who says, this is his place or this is your place? None of those factors are here because the officers did zero surveillance. And for that reason, suppression here is consistent with the goals. Let me ask you this. If, in fact, Officer Skibar knew that he hadn't been at his residence for six times when they went out to find it, would there be probable cause? Your Honor, I think that if – I mean, as I read your brief, it seemed to me that you were hinging your total argument on whether he knew that he hadn't been in his residence for six times or whether he didn't know. So I'm asking you the question. Supposing he knew that he hadn't been there for six times, would that have provided the probable cause necessary under Howard? No, Your Honor, it would not. Why not? Because what we have here is an informant tip where there's no basis for knowledge, no reliability, no track record whatsoever of the arrest. We're not talking about that. We're talking about the fact that he – what Judge Smith is asking you is forget the informant. What if he just knew clearly – what if all of the probation report – the record doesn't say it, but suppose all of the probation notes had been read to the officer before he did the search, including the fact that he had gone to the house six times, apparently two times nobody was there, four times somebody was there. He looked at the – he went to the bedroom twice. He said the bedroom doesn't look like anybody's living here, all of that. Let me be 100 percent crystal clear, and the notes are at excerpts of record 161 to 162. If the entirety of the notes had been read, this is what they would say. Mr. Vasquez himself was present once. Subsequent to that, there were these six unsuccessful visits. There's nothing in the notes reflective of the officers going into the bedroom or finding it unlived in. That is exclusively from Officer Rodriguez's declaration. The district court, in fact, made numerous factual findings, and one of them was that Rodriguez's personal knowledge, something that is not in the notes, only his personal knowledge is not before the court. So there's nothing in the notes that he went to the bedroom? I'm sorry? There's nothing in the notes saying he went to the bedroom? Correct. That is not present in the notes. I see. It's just I went there six times and he wasn't there. That's correct. Also, I went there a seventh time and he was there. And a seventh time he was there, the first time. And in addition, there are other significant facts. Mr. Vasquez twice responded to messages that were left for him at that residence. That's a fact this court found significant in Daly. Twice he was told to appear in person on very short order. The district court? Did the district court concentrate on that fact? The district court references the notes in her analysis. The spirit of her analysis is let's assume all of the facts most favorable to the government in the way the government has argued them. The district court specifically found that Officer Rodriguez's personal knowledge was not part of the court's probable cause determination, made that finding a fact. The government has not challenged that on appeal and cannot challenge it now. So if the entirety of the notes were read, they in fact would paint a much different picture than a 0% success rate. What we have is 1 in 7 as opposed to 0 in 6. That's a lot closer to the 2 in 10 in Howard than it is to the 1 in 21 in Conway or the 1 in 60 in Watts. We also have twice responding to messages to appear in person on very short order once the next day. That's consistent with Daly where they found it was significant that while they didn't know if the probationer hadn't been found there, they knew he hadn't responded to messages at his reported address. And then we also have the other facts that Your Honor... Where in the ER are the notes? 161 to 162, Your Honor. Go ahead. So again, that fact I would submit to the court does not support probable cause because again, as Your Honor pointed to, there are those additional facts. He was at work. That's easily verifiable. It was his probation officer who knew, in fact, he was working. So, Your Honor, if that was the only fact before the court, it's not suggestive of that being a false residence. And the other facts before the court are not suggestive of it being a... I'm sorry, of the Pomona residence being his residence either. And again, I'd like to be very specific here. The government has pointed to a statement that Mr. Vasquez made to his girlfriend at some point about a month prior to the search that he was staying frequently with his girlfriend. That fact, again, is only in Officer Rodriguez's declaration and is not in the notes. So what we do have here is his presence outside four months prior. That's certainly much less significant than in Granberry where he was present very frequently and using a key to come in and out of the searched residence. We also have the tipster, and we know essentially nothing about him. This is not a tip that's so detailed as in Gates or as in Rowland where it could be self-verifying of some level of knowledge. Again, if the officers were able to corroborate any of the details. Wait a minute. He is a co-gang member, right? And he does know a name or two, right? Yes. It's not as if there are literally zero facts, but the facts are so much less significant than they were in Rowland where this court found they were only supportive of reasonable suspicion. In Rowland, he knew he was a probationer. He knew specific details about where he was on probation, that he was planning to make a particular flight. The officers were then able to verify that. They watched him do the things that the tipster said he would do. And so while the tipster was otherwise unknown, there was enough predictive detail to be able to reach that threshold of some indicia of veracity or basis for knowledge, however, only of reasonable suspicion. And here, of course, we have probable cause to search a residence, and the residence is the core protected space under the Fourth Amendment. So, Your Honor, those facts added together don't amount to probable cause. The district court did not engage in a divide-and-conquer analysis. At excerpts of Record 31 and 37, the district court engaged with both counsel for the government and for the defense, mentioned the totality of the circumstances standard, and showed she knew how to apply it. She stated, for example, to defense counsel, this extra fact that Pinelli says she's visiting, doesn't that sort of shore up those other facts? She understood what it meant to have a totality test and how to balance it, and in her written order, she goes through in great detail all of this court's precedents. But we have deferred the district court's probable cause standard anyway, doing determination. I'm sorry? Do we defer the district court's probable cause determination? No, of course not. This court's standard is de novo. No, it doesn't matter. It doesn't matter. The only reason I raise it is because the government has made quite a point of it in their briefing, and it's really the thrust of their briefing. I understand them to be telling us we shouldn't do the same thing, not that it matters what she did. Well, the government is absolutely right in that case. This court shouldn't do the same thing. But on balance, the facts do not add up to probable cause. And if I could just very briefly make clear the state of the record as to the door being ajar. The government seemed to suggest in its briefing the door wasn't ajar or wasn't perceptibly ajar. Officer Skivar's declaration at 146, he says he knocked upon the door, which was already slightly open. His testimony is entirely consistent with that. Does this matter? I mean, if you prevail on the other ground, does this matter at all? I don't understand the relevance of it. It seems to me the question of how you treat a screened door is not self-evident. And does it matter? Well, the government says that these additional facts of his presence with another person inside and of Ms. Pinales saying, I'm just visiting him, that this would kind of tip the scales, even if it weren't enough at that point. Because they wouldn't otherwise have known this other woman was there? Is that what you're saying? No, the government's position, as I understand it, is that even if this court finds that the other facts weren't sufficient for probable cause, the fact that Mr. Vasquez is then present at the time that the door is opened and that Ms. Pinales says she's just visiting, that those additional facts are sufficient for probable cause. That's the argument the government made when he stood up here a moment ago. Yeah, but that's a little weird because, I mean, if the door had been closed and they knocked on it and he opened it, it would have been the same thing. Well, the district court treated it as an independent Fourth Amendment violation. Well, that's right. That's what I'm saying. So it doesn't matter to the probable cause with regard to whether he lived there. Well, Your Honor, our position is the court shouldn't consider those facts at all because it was the product of an independent Fourth Amendment violation for the officers to learn them. Because they opened a screen door or because they knocked on it? Well, I don't know. I don't know how you could ever do a knock. Maybe I know different kinds of screen doors, but it's pretty hard to knock on a screen door. This one was a metal door. So there's no reason why you would think that the occupant wouldn't have heard the door being knocked upon. Since it's a metal door, it would make some sound. And in Arellano Ochoa and in Walker, which the government relies on heavily, the basic principle is where the door inside is open and the screen door is closed, that's the primary barrier that the occupants are creating with the outside world. So the officer first at least has to try knocking on it. If that doesn't work, then Walker, which again is a Tenth Circuit case, but Walker would say the next reasonable thing you can do, because it's what a neighbor or anyone else would do, is to open it up and try knocking on the interior door. But, of course, here we don't even have those facts. The officers, seeing that the door was ajar, went ahead and opened the screen anyway and then knocked the door open. And that's why we would, consistent with the district court's conclusion, contend that those additional facts cannot be considered in the probable cause analysis. Even if they are considered. But even if you did consider it. They don't add very much, if anything at all. Visiting is. Well, the fact that he was there, they do add that. But that would only matter if you assume that he would have not opened the door if it were knocked on. That's correct, Your Honor. All right. Thank you for your argument, sir. Give me one minute. Thank you, Your Honor. Thank you very much. So I've now looked at the notes, and they don't say anything about coming in and seeing that he wasn't living in the room or anything like that. And they do say the messages that were left there got to him. So even if they read all the notes, and they did say that at least once they did find him there. So what does it prove? So it's that there were at least six, by my count, eight times that they went he wasn't there. So that's what the notes show, and there's no question that Shlobom said that she read that to Skibar. They don't say that they went into his room and it didn't look lived in. So that we rely on Jensen for collective knowledge. This is an AB-109 probation enforcement task force. So another officer on that same task force is talking to other officers. Jensen says that. With the last ten seconds, let me just say the knocking on the door was absolutely permitted, and it is fundamentally important because the probable cause question here is, do they have probable cause to think he lives there? An informant says he lives there. They see him there. The informant says unit 26. They knock on the door. When the door slides open, they see him sitting in there with a woman who says, I don't live here. He does. I'm just here visiting him. They haven't invaded yet. At that point, a reasonable person, not a Ninth Circuit judge or a government attorney, but a reasonable law enforcement person under the Wesby standard, could definitely have a substantial chance and probable cause to believe he lives there. And what about the question of not knocking on the screen door? So the screen door is, first of all, it's a metal screen door. Beyond that, we don't have facts on the record. But Arianna Ochoa, we believe, supports our position here, as does the Tenth Circuit case, which is to say when there's a screen door and a mostly closed wooden door inside, it is just normal for the average citizen, which informs the Fourth Amendment analysis, to not bang on some hard metal door, which may or may not make a noise, but to open and knock on the thing we all know we do, which is the wooden door. Then the door swung open and blocked off the detective's view. Big surprise. I mean, if you knock on an open door, it's going to open. But if you open it. It was slightly ajar. It wasn't wide open. But ordinarily, or at least if you didn't want that to happen, you would not knock on the door. You'd knock on the door jam, which is what. But you must knock on the door under the knock and announce rule. So then they're in a Hobson's choice. What do you mean? You mean if you knocked on – I mean, ordinarily, if I knock on the door, I think what I knock on is the casing for the door. Oh. Under our NHOA, and I don't know. It just seems normal under standards of what reasonable people do, which is in forms of the Fourth Amendment, that when one comes to a screen door, particularly one that's metal, that's all we know on the record, admittedly, that's not so easy to always make a sound. And it's certainly not comfortable to knock on. And typically people then knock on a door that mostly obscures the doorway, which is wood. And when that happened, they see him inside, which corroborates and interlocks with all the other facts they know, that he lives in unit 26. And before they conduct their search, a woman says, oh, hey, I don't live here. He does. I'm just here to visit. If that's not probable cause, then the probable cause standard with respect has mutated in this line of cases well beyond the confines that WESB permits. And under Miller v. GAMI, this panel absolutely should hold that there's probable cause in this case. Thank you. She never said that he lives there. She said, I'm just here to visit him. Yeah. That's a big difference. Yes, Your Honor, you're absolutely right on that. I don't live here. I'm here to visit him. Again, a reasonable person knowing everything else would say, okay, he lives here. Okay. Okay. Thank you very much. Thank you both for your argument.
judges: Berzon, N.R. Smith, Nye